THE MASSACHUSETTS MEDICAL SOCIETY *vs.* COMMISSIONER
OF INSURANCE
(and a consolidated case).

Suffolk. December 10, 1987. — March 30, 1988.

Present: HENNESSEY, C. J., LIACOS, NOLAN, & LYNCH, JJ.

*Insurance,* Commissioner of Insurance, Medical malpractice insurance, Rating. *Commissioner of Insurance. Administrative Law,* Judicial review, Agency's interpretation of statute.

In a proceeding before the Commissioner of Insurance to fix and establish physicians' malpractice insurance rates for the rate years beginning July 1, 1985; July 1, 1986; and July 1, 1987, the Commissioner did not exceed his statutory authority by according preliminary approval to a statistically-based experience rating plan to be implemented in the rate year beginning July 1, 1988, and, inasmuch as a final plan for that year had not yet been presented for adoption, judicial review of the Commissioner's action would be premature. [47-49]

In calculating and apportioning, pursuant to St. 1986, c. 351, § 38, physicians' Total Deferred Premium Liability (TDPL) with respect to medical malpractice insurance for the 1983, 1984, and 1985 rate years, the Commissioner of Insurance could properly differentiate among insureds based on their differing types of coverage, rather than determine these charges solely by risk classifications based upon medical specialties, and his classifications were supported by substantial evidence. [49-50]

In calculating and apportioning, pursuant to St. 1986, c. 351, § 38, physicians' Total Deferred Premium Liability (TDPL) with respect to medical malpractice insurance for the 1983, 1984, and 1985 rate years, the Commissioner of Insurance erred by excluding deferred premiums represented by rate increases in "reporting endorsements" issued during those rate years. [50-52]

In a 1987 proceeding to fix and establish physicians' malpractice insurance rates, the Commissioner of Insurance correctly precluded the underwriters' association (JUA) from requesting adjustments to the 1983 and 1984 premium charges to permit JUA to recover investment income lost to it due to a statutory postponement of the collection of rate increases, where such a request had been considered in a 1985 decision of the Commissioner which JUA had not appealed to this court. [53-54]

In a 1987 proceeding to fix and establish physicians' malpractice insurance rates, the Commissioner of Insurance, in denying a request to adjust the premium charges for the 1985 and 1986 rate years to permit the under-writing association (JUA) to recover investment income lost to it due to a statutory postponement of the collection of rate increases, properly relied on the presumption that existing rates were adequate, in view of the tardy filing of JUA's request [54-55]; moreover, as to the 1985 rate year, the Commissioner properly interpreted St. 1986, c. 351, § 38, as precluding the recovery sought [55], and, as to the 1986 rate year, concluded properly, on the basis of substantial evidence, that the invest-ment loss would be minimal [55-56].

In a decision by the Commissioner of Insurance fixing and establishing physi-cians' malpractice insurance rates, the Commissioner's reference to the recoupment provisions of St. 1980, c. 333, did not constitute an admis-sion by him that the newly-established rates were inadequate. [56-57]

A conclusion by the Commissioner of Insurance that, as a result of the enactment of provisions of St. 1986, c. 351, increasing the authority and enforcement activities of the Board of Registration in Medicine, together with the board's promulgation of new patient care regulations, medical malpractice costs would decrease sufficiently to warrant a one-percent reduction in physicians' malpractice insurance premiums, was not supported by substantial evidence where the Commissioner, in a rate-fixing proceeding before him, had received no evidence from the parties tending to show that the new regulation would deter substandard medical practice. [57-59]

In a proceeding to fix and establish physicians' malpractice insurance rates, substantial evidence before the Commissioner of Insurance in the form of credible expert testimony supported his conclusion that an amendment of G. L. c. 231, § 60B, increasing from $2,000 per defendant to $6,000 per action the amount of the bond that a plaintiff is required to furnish in order to proceed with a medical malpractice claim after suffering an adverse ruling of a medical malpractice tribunal, would have a sufficient deterrent effect on litigation to warrant a one-percent reduction in insur-ance rates. [59-60]

In reviewing a determination by the Commissioner of Insurance of the total dollar increase in medical malpractice insurance premiums which, under G. L. c. 175A, § 5B, was to be partially recovered by physicians in the form of increased medical service corporation (Blue Shield) payments to them, this court, according "weight and deference" to the Commis-sioner's statutory interpretation, found no error in his methodology whereby he recalculated the experience for the 1983 rate year at the newly-established rates for 1986 and 1987, disregarding revenue in-creases resulting from changes in insurance purchasing patterns of insured physicians and employing, for the number of physicians insured, a synthetic figure based on an averaged three-year physician population. [60-63]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk, two on May 11, 1987, and one on June 3, 1987.

The cases were reported by *Liacos, J.*

*Acheson H. Callaghan, Jr., (Michael J. Lacek* with him) for The Medical Malpractice Joint Underwriting Association of Massachusetts.

*Cheryl L. Conner,* Assistant Attorney General, for the Commissioner of Insurance.

*Michael T. Gengler & Kenneth Laurence* for The Massachusetts Medical Society.

*Jeffrey Swope (Kevin E. Hulslander* with him) for Blue Shield of Massachusetts, Inc., intervener.

NOLAN, J. A single justice of the Supreme Judicial Court for the county of Suffolk reserved and reported to the full court two consolidated complaints seeking review of the decision by the Commissioner of Insurance (Commissioner) fixing and establishing medical malpractice insurance rates for physicians and surgeons effective July 1, 1985, 1986, and 1987, and establishing the first instalment of the deferred premium liability charges for 1983, 1984, and 1985 pursuant to St. 1986, c. 351, § 38. A separate complaint seeking review of two post-decision implementation orders of the Commissioner was reserved and reported to the full court and consolidated with the above described action for a determination of all the issues.

The first complaint, brought by the Massachusetts Medical Society (MMS or "the Medical Society"), challenged the Commissioner's April 21, 1987, decision setting medical malpractice insurance classifications and rates under G. L. c. 175A, § 5A, and establishing adjustments to physicians' charges to Blue Shield of Massachusetts, Inc. (Blue Shield), under G. L. c. 175A, § 5B. A second complaint seeking review of the same decision of the Commissioner was filed by the Medical Malpractice Joint Underwriting Association of Massachusetts (JUA). MMS and JUA filed cross motions to intervene, which motions were granted by the single justice along with Blue Shield's motion to intervene in the MMS complaint.

Subsequent to the Commissioner's April 21, 1987, decision, the Medical Society filed a separate complaint for review of two rulings made by the hearing officer and affirmed by the Commissioner concerning the calculation of the dollar amount of Blue Shield's additional payments to physicians resulting from the medical malpractice insurance premium increases. The single justice allowed Blue Shield's motion to intervene.

A. *Experience rating plan.* MMS objects to the Commissioner's adoption of a design for an experience rating plan for physicians to be implemented in the 1988 rate year. The Medical Society alleges that the Commissioner erred in approving the statistical plan for experience rating proposed by the State Rating Bureau (SRB) over the peer review plan offered by MMS. The Commissioner affirmed the statistical design under both St. 1986, c. 351, § 36, and G. L. c. 175A, § 5A. We agree with the Commissioner's determination.

MMS argues that the Commissioner was without statutory authority to adopt an experience rating plan effective July 1, 1988, in a proceeding conducted to fix and establish rates for the years 1985, 1986, and 1987, and that notice of his intention to implement a plan for 1988 was insufficient. The Medical Society contends that the experience rating plan endorsed by the Commissioner is unfair, unreasonable and in violation of the Fourteenth Amendment to the United States Constitution and arts. 1, 6, 7, and 10 of the Massachusetts Constitution. MMS further alleges that the experience rating plan is unsupported by the evidence, and that the statutory classification system which will govern the finalized experience rating plan is too vague to be constitutionally applied. Because we are unconvinced that the Commissioner's preliminary approval of the statistically based experience rating plan is tantamount to "fixing and establishing" risk classifications and premium charges under § 5A, we see no merit in the Medical Society's claims.

This court considered the question whether premium charges under an experience rating plan were fixed and established by a decision of the Commissioner in *Century Cab, Inc.* v. *Commissioner of Ins.,* 327 Mass. 652, 660 (1951). We held that

"[a] rate may be fixed where its elements are settled and where all that remains to be done is to combine those elements by the employment of a definite rule, or as here by mathematical process. . . . The rates in the instant case depend not upon future factual contingencies for their determination but on present established facts." *Id.* at 664-665 (citations omitted). The Commissioner's finding that an experience rating plan shall be implemented in 1988, along with his approval of a provisional plan, does not amount to a fixed and established rate determination under the test set forth in *Century Cab*. The Commissioner did not fix the premium charges, establish specialty group classifications, nor did he promulgate a complete formula through which these determinations could be made. Rather, the Commissioner directed JUA to work with SRB and MMS to accumulate the necessary factual data to formulate and implement a comprehensive experience rating plan for the 1988 rate year. To that end, the hearing officer made various findings which, when combined, outlined a feasible experience rating plan that, once formulated, would conform to the statutory scheme. The Commissioner then affirmed the plan and correctly determined that the hearing officer was within his authority to endorse the design under both G. L. c. 175A, § 5A, and St. 1986, c. 351, § 36.[1]

Until a finalized experience rating plan is presented for implementation in the rate year 1988, the Medical Society's challenges to the validity of the present plan are premature. We serve the interests of neither the administrative nor the judicial process by reviewing in a piecemeal fashion administrative proposals for measures not yet fully formulated. The better policy is to allow the administrative process to run its course before permitting appellate review, thereby granting the admin-

---

[1] We agree with the Commissioner that the hearing officer erred in determining that St. 1986, c. 351, § 36, precluded the Commissioner from exercising his broad powers under G. L. c. 175A, § 5A, to construct a plan for experience rating. Although we are of opinion that the design endorsed by the Commissioner can produce an experience rating system that will conform with § 5A and § 36, until the plan is finally formulated the issue is not properly before the court for review.

istrative agency a sufficient opportunity to apply its expertise to develop regulations in conformity with the statutory scheme. *Assuncao's Case,* 372 Mass. 6, 8-9 (1977). The parties will have ample opportunity to renew any applicable objections to the completed plan once it is introduced for adoption during the 1988 hearings.

B. *Collection of deferred premium liability.* Statute 1986, c. 351, § 38, amended G. L. c. 175A, § 5A, and set forth the scheme through which JUA could recover Total Deferred Premium Liability (TDPL).[2] The statute provided deferral of the amount due until July 1, 1987, and specified that predetermined portions of the total would be collected annually over a five-year period. St. 1986, c. 351, § 38 (3). MMS and JUA challenge the Commissioner's decision with respect to various findings concerning the calculation and apportionment of TDPL.[3]

MMS objects to the Commissioner's separate treatment of corporate and partnership coverages, and of claims made, occurrence, and reporting endorsement coverages in apportioning deferred premium liablity. The Medical Society demands a narrow interpretation of § 38 which would require that deferred premium liability charges be determined solely by risk classifi-

---

[2] Total Deferred Premium Liability is defined as "an amount equal to the difference between the amount of premium charges payable with respect to all policies issued on or after July [1, 1983] and before July [1, 1986] for medical malpractice insurance for physicians in the commonwealth insured by the medical malpractice joint underwriting association, created pursuant to [St. 1975, c. 362, § 6], as finally established with respect to such policies pursuant to the provisions of [G. L. c. 175A, § 5A], and the amount of premium charges which were payable with respect to such policies during said period, as established by the commissioner of insurance in his decision dated May [18, 1984]."

[3] Additionally, MMS argued that the Commissioner erred in setting the effective date of the TDPL billing at July 1, 1987, regardless of when individual policies were issued or renewed. JUA represents, however, that as a result of a subsequent agreement between the parties, the hearing officer issued an Implementation Order, dated May 4, 1987, which provided that TDPL charges would be billed to insureds on their policy renewal dates. The issue is therefore moot and requires no further consideration. *International Marathons, Inc.* v. *Attorney Gen.,* 392 Mass. 376, 380 (1984) (mootness doctrine applies to judicial review of administrative decisions).

cations based upon medical specialities.[4] The Commissioner disagreed with MMS's interpretation and concluded that because corporations and partnerships were charged different rates in 1983, 1984, and 1985, these insureds warranted different treatment regarding the collection of their deferred premium liability. Similarly, the Commissioner endorsed the assessment of TDPL as a percentage of premium, which resulted in different charges for physicians with various types of coverage. MMS argues that any deferred premium charge scheme other than a flat rate would discriminate on grounds other than medical specialty, and therefore violate the statute.

There is no language in the statute which precludes the Commissioner from assessing different premium liability to distinguish between the types of coverage held by insureds within their respective risk classifications. It was within the Commissioner's discretion under G. L. c. 175A, § 5A, to differentiate among insureds based on their differing costs of coverage. His ruling complied with the intent of the Legislature, and his classifications were supported by substantial evidence.

We are persuaded, however, by MMS's and JUA's joint contention that the Commissioner erred in failing to include the deferred premium for reporting endorsements in his calculation of TDPL.

Reporting endorsements are policies purchased by physicians to protect themselves against claims of malpractice made after they discontinue their claims-made insurance policies. Unlike an occurrence policy which covers malpractice claims arising from the physician's conduct during the period in which the occurrence policy is effective, regardless of when the claim is filed, a claims-made insurance policy covers only claims reported to JUA during the effective term of the policy. Therefore, when a physician formerly carrying a claims-made policy

---

[4] MMS directs us to the language in § 38 (3) which states in pertinent part: "The commissioner shall attribute to each such classification that portion of the [TDPL] then outstanding which accrued with respect to policies . . . issued on or after [July 1, 1983] and before [July 1, 1986] for *physicians engaging in the practice or specialty included in such classification* as of the date of such determination" (emphasis added).

either changes his coverage by purchasing an occurrence policy or discontinues practicing medicine, he is vulnerable to any claim arising from an incident that occurred during the life of his claims-made policy but was reported to JUA after the policy's termination. A reporting endorsement is a policy designed to protect the physician from liability arising from these belatedly filed claims. Reporting endorsements are separate policies with separate premium charges assessed pursuant to the rate increases ordered from 1983, 1984, and 1985, the collection of which has been deferred under St. 1986, c. 351, § 38.

JUA, MMS, and SRB[5] argued that the reporting endorsement rate increases should have been included in the TDPL calculation in accordance with c. 351, § 38. The Commissioner rejected the parties' recommendations and excluded reporting endorsements from his calculation of TDPL. Instead, he ordered that the rate increases for reporting endorsements purchased in 1983, 1984, and 1985 be collected by the JUA through direct rebilling of the physicians covered by reporting endorsements during those rate years.

Statute 1986, c. 351, § 38 (1), defines TDPL as a sum equal to the difference between the amount of premium charges payable with respect to "all policies" issued between July 1, 1983, and July 1, 1986, and the amount of premium charges payable on these policies as established by the 1984 decision of the Commissioner. The Commissioner's determination to exclude reporting endorsements from TDPL because "the Legislature did not intend this relatively small DPL piece to be subject to reallocation to current insureds" directly contradicts the express language of the statute, and ignores the strong presumption that each word and phrase of a statute is to be given full force and effect. *United States Jaycees* v. *Massachusetts Comm'n Against Discrimination,* 391 Mass. 594, 602 (1984).

---

[5] SRB endorsed a modified version of MMS's and JUA's proposal which assigned a share of deferred premium liability charges for reporting endorsements issued in 1983, 1984, and 1985, only to policyholders who obtained reporting endorsements after July 1, 1987.

The error is not remedied by the Commissioner's classification of the direct rebilling order as an equitable and logical transfer of "this portion of [T]DPL in the IDPL." The Commissioner's reasoning ignores the fact that the Legislature provided in § 38 (3) that IDPL (deferred premium liability collected from individual physicians) would be deducted from the total deferred premium liability owing to JUA. Therefore, it is essential to the statutory scheme that the deferred premium liability attributable to the delayed collection of increased reporting endorsement premiums must first be included with all other policies in the TDPL calculation under § 38 (1). Unless the IDPL is added to the sum of TDPL, any IDPL offset for direct reporting endorsement rebilling would improperly reduce the TDPL and prevent JUA from collecting all the deferred premium liability to which it is entitled under § 38. See *Commonwealth* v. *Galvin,* 388 Mass. 326, 328 (1983) (each clause of statute is to be examined with reference to every other clause so that all parts are construed as consistent with purpose of statute). Only after reporting endorsement premium increases are included in TDPL may the Commissioner direct that the collection of those sums be apportioned as IDPL.

We, therefore, remand this matter to the Comissioner to adjust the calculation of total deferred premium liability to include the increases in premium charges for reporting endorsements issued in the rate years 1983, 1984, and 1985. To the extent that the inclusion of reporting endorsement premium liability affects the final rate increase and collection directives set by the Commissioner, appropriate adjustments shall be made. We leave it to the discretion of the Commissioner whether further hearings are necessary to compile the data required to make the adjustments.

C. *Lost investment income.* On December 24, 1985, the Governor approved St. 1985, c. 671, which froze medical malpractice premium rates for policies issued after July 1, 1984, at the levels set in the Commissioner's May 18, 1984, decision establishing the 1983 rates. The moratorium was effective until May 1, 1986, and subsequently extended until July 1, 1986. JUA was barred from collecting premium in-

creases during the years affected by the freeze. Consequently, JUA was unable to invest the uncollected sums.

JUA contends that delays in the collection of the total premium amount resulted in lower investment income earnings than those anticipated during the rate establishment process. Therefore, the total revenue JUA received (i.e., collected premiums plus investment income on those premiums) was not equal to its anticipated expenditures. JUA presented several expert witnesses who testified during the 1987 hearings that a rate adjustment was needed to offset the resulting imbalance in revenues caused by the loss of investment income. JUA argues that the Commissioner's failure to provide for an increase in premium rates to reflect the decreased investment yields was error. We must determine whether the rates ultimately set by the Commissioner were supported by substantial evidence in the record. *Medical Malpractice Joint Underwriting Ass'n* v. *Commissioner of Ins.*, 395 Mass. 43, 55-56 (1985) (substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion).

During hearings held in 1985, JUA requested an adjustment for lost investment income due to delays in the establishment and collection of the 1983 and 1984 premium increases. In his decision dated December 26, 1985, the Deputy Commissioner provided JUA with a compensatory adjustment by tempering investment yield values to reflect lost investment income. JUA appealed the decision to the Commissioner and sought additional rate increases over and above those provided by the Deputy Commissioner. The Commissioner denied JUA's request in a decision issued June 6, 1986. JUA failed to file timely an appeal of the decision under G. L. c. 175A, § 5A.

In the 1987 hearings, the Commissioner refused to allow JUA to renew their request for 1983 and 1984 rate adjustments, noting that "[s]ince this decision [June 6, 1986] was not appealed to the Supreme Judicial Court, it has become final, and is dispositive on the issue of lost investment income from the 1983 and 1984 rate years." We agree. See *Harker* v. *Holyoke*, 390 Mass. 555, 558-559 (1983) (judgment is final where plaintiffs litigate issue, lose on merits, and chose not to appeal).

Therefore, our review is limited to the denial of JUA's request for lost investment income adjustments for rate years 1985 and 1986.

JUA argues that the Commissioner erred in failing to adjust the 1985 and 1986 premium charges to reflect lost investment income due to the statutory postponement of the collection of rate increases for these years. The Commissioner's reasons for denying JUA's request for an adjustment were that: (1) JUA did not file timely requests for the rate increases; (2) the Legislature preempted the issue of the effects of collection delays when it enacted c. 351, § 38, and permitted the collection of interest above the prevailing rates on uncollected deferred premium liability as of July 1, 1987; and (3) the minimal losses, if any, attributable to investment delays for these rate years could be recovered through the recoupment provision of an existing statute. For the reasons set forth below, we affirm the Commissioner's denial of JUA's requests for lost investment income adjustments for the years in question.

1. *JUA's untimely request filing.* In its brief, JUA failed to address the Commissioner's first basis for denying its appeal, JUA's untimely filing of rate requests. The Commissioner noted that JUA was late in filing for 1985 rate increases and filed for 1986 increases just a few days before the end of rate year 1985. In determining whether rate adjustments were warranted, the Commissioner relied on the presumption that existing rates are adequate unless JUA acts to request rate increases. The Commissioner concluded that "immediate collection of increased rates was not indicated" because JUA failed to seek timely rate increases.

The Commissioner must have adequate time from receipt of the rate request filing to permit review of the record, the scheduling of a hearing and issuance of the decision. See *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 191 (1969). Moreover, as the Commissioner noted, throughout the ten-year history of medical malpractice rate proceedings, rates have been presumed adequate unless JUA acts in a timely manner. The Commissioner acted reasonably and within his discretion in viewing JUA's untimely filing as an indication that

the existing rates were adequate. See *Metropolitan Property & Liab. Ins. Co.* v. *Commissioner of Ins.*, 382 Mass. 514, 524 (1981) (party cannot remain silent while administrative agency appears to be proceeding in error and later complain of error on review).

2. *Chapter 351, § 38, preemption.* The Commissioner concluded that the Legislature provided the exclusive remedy for lost investment income on the uncollected remainder of the delayed 1985 premium charges. The Commissioner's interpretation of § 38 is entitled to deference. *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 474-475 (1983). When it enacted c. 351, § 38, the Legislature resolved the issue of lost investment income which otherwise would have been left to the Commissioner's discretion. Since § 38 does not authorize recovery of a separate rate for additional investment income losses, it was proper for the Commissioner to interpret the statute as precluding such a recovery.

JUA also complains, and the Commissioner recognized, that c. 351 only provided for the accumulation of 11% interest on the uncollected sums as of July 1, 1987. Presumably, if the Legislature intended that interest be paid from the date premiums were originally due, c. 351 would have included a provision to that effect. It is not the responsibility of the Commissioner or the court to make adjustments for perceived inadequacies in the statutory scheme enacted by the Legislature. See *James J. Welch & Co.* v. *Deputy Comm'r of Capital Planning & Operations*, 387 Mass. 662, 666 (1982).

JUA correctly notes, however, that the 1986 rates were not subject to c. 351. Therefore, JUA argues, the Commissioner could not rely on that statute as providing a justification for his refusal to include an adjustment in the 1986 rates. While it is true that the Commissioner could not base his denial of JUA's request for lost investment income adjustments for rate year 1986 on c. 351, there was, nonetheless, substantial evidence supporting his decision.

As mentioned above, JUA filed its request for 1986 rates just days before the 1986 rate schedule was to be effective. JUA could not have reasonably expected that it would then be

entitled to a rate adjustment to reflect the resulting billing delays. Here, as with JUA's late filing for rate year 1985, the Commissioner was entitled to presume the adequacy of the existing rates.

The Commissioner's refusal to include an adjustment for 1986 rates was also reasonable in light of his conclusion that there would be minimal, if any, investment income losses resulting from delayed collection.[6] This conclusion was based on evidence that after discounting the amount of time necessary for billing, lost investment time would be negligible. Since the Commissioner was reasonably convinced of the de minimis effect of the delays, he was justified in refusing to provide rate adjustments on that basis.

3. *Recoupment provision.* Finally, the Commissioner noted that if the rates, as set, were subsequently found to be inadequate, St. 1980, c. 333, provided JUA with a provision for recoupment of the difference. JUA argues that the Commissioner cannot rely on the recoupment provisions to avoid his obligation to fix sound and self-supporting rates. In support of its argument, JUA directs our attention to the decision in *Medical Malpractice Joint Underwriting Ass'n* v. *Commissioner of Ins.,* 395 Mass. 43 (1985), where we rejected the Commissioner's argument that there was a legislative preference for "erring on the side of inadequate insurance rates." *Id.* at 50.

JUA's reliance on the above case is misplaced. In that decision, we reversed because the Commissioner erroneously imposed a higher evidentiary standard of proof on the proponents of a rate increase. *Id.* at 51. There, the Commissioner argued unsuccessfully that he was not required by statute to set self-supporting rates. *Id.* at 52. In the instant case, however, the Commissioner's reference to the recoupment statute did not constitute an admission that the rates were inadequate. The Commissioner used his considerable expertise in determining the rate levels. He merely recognized that, despite his best

---

[6] The Commissioner reached the same conclusion with regard to the delayed collection of the 1985 rate year premium increases.

efforts, rate inadequacies would sometimes result. On those occasions, the recoupment provisions of St. 1980, c. 333, would provide relief.

In sum, the Commissioner was justified in refusing JUA's request for adjustments to reflect lost investment income for rate years 1983, 1984, 1985, and 1986. His determinations were supported by: the preclusive effect of the prior, unappealed June 6, 1986, decision; the presumption arising from JUA's tardy filing for rate requests for 1985 and 1986; and the provisions of c. 351, § 38, establishing the exclusive remedy for lost investment income due to the moratorium on the collection of premium rate increases.

D. *Reduction of rates to reflect savings.* Chapter 351 significantly amended certain laws affecting the practice of medicine and the procedures for commencing medical malpractice actions. The Commissioner solicited and considered the interested parties' submissions concerning the anticipated effects of c. 351's legislative reforms. Specifically, the Commissioner evaluated the impact of the following changes while establishing the rates for 1985, 1986 and 1987: (1) the increased authority and enforcement activities of the Board of Registration in Medicine (BRM); and, (2) the changed tribunal bond amount required to be posted by a plaintiff who wishes to proceed to suit after his or her case receives an adverse determination by a malpractice tribunal. After hearing experts and assessing the parties' recommendations, the Commissioner concluded that c. 351 would have the effect of decreasing medical malpractice costs and he therefore reduced the 1985-1987 rates to reflect the anticipated savings. JUA now requests that this court reverse the Commissioner's decision on the ground that the reductions were not based on substantial evidence.

1. *Increased authority and enforcement activities of BRM.* During the hearings, several experts attempted to quantify the predicted deterrent effect of the BRM's increased disciplinary activities pursuant to c. 351 and predict any resulting reduction in medical malpractice costs. The Commissioner relied on the testimony of Peter Clark, chief of enforcement for BRM, who

detailed projected increases in the number of suspensions and revocations of physician's licenses by the BRM. In addition, SRB presented evidence supporting its predictions of the anticipated impact of c. 351 upon medical malpractice claim frequency. The Commissioner also considered evidence presented by JUA critiquing SRB's claim frequency forecasts.

The Commissioner further invited the parties to submit evidence during the hearings on the impact of BRM's new patient care regulations. 243 Code Mass. Regs. §§ 3.00 et seq. JUA and MMS declined to do so. Likewise, SRB offered no evidence, indicating only its belief that the issue had previously been covered by implication during the presentation of evidence on BRM's increased enforcement activities under c. 351. The Commissioner proceeded to examine the preamble of the new patient care regulations and reached his own conclusions regarding their anticipated impact on medical malpractice costs without any evidence from the parties.

The Commissioner concluded that the combined impact of the c. 351 reforms and the new patient care regulations warranted a one percent rate reduction to reflect savings. The Commissioner estimated that the strengthened legislative and regulatory scheme would result in .3%, .9%, and 1.8% reductions in the claim frequency for the 1985, 1986, and 1987 rate years.

We hold that, to the extent that the Commissioner included anticipated savings from the new patient care regulations, his calculation of the one percent rate reduction was erroneous. The Commissioner received no evidence from the parties tending to show that the patient care regulations would deter substandard medical practice.[7] "It is one thing to exercise some

---

[7]The lack of evidentiary support for the Commissioner's conclusion is reflected in his comment: "Further, I find the BRM regulations, the announced intention in their preamble, the plain legislative and regulatory intent and common sense that any reader of those regulations can exercise, all support the Hearing Officer's finding of a major deterrent effect." See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 389 Mass. 824, 844-845 (1983) (unfounded estimate of anticipated savings did not provide reasonable support for presumption of 1% reduction of costs).

judgment, and another to speculate as to the existence of some future fact with no explanation of how the exercise of judgment leads to the conclusion that cost reduction will occur in the future." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 389 Mass. 824, 845 (1983).

The record does not enable us to determine what medical malpractice cost savings, if any, will result from the new patient care regulations. Accordingly, we reverse the Commissioner's decision, leaving it to his discretion whether to omit from his rate reduction calculation anticipated savings from new patient care regulations, or to hold further hearings to determine if an adequate evidentiary foundation exists on the record to justify inclusion of these presumed savings.

2. *Tribunal bond increase.* Finally, the Commissioner considered the impact of increased tribunal bond amounts on medical malpractice actions. Chapter 351, § 21, amended G. L. c. 231, § 60B, by requiring a plaintiff to post a $6,000 bond per action in the event that the plaintiff wished to proceed with the suit after suffering an adverse ruling of a medical malpractice tribunal.[8] St. 1986, c. 351, § 21.

The Commissioner considered expert testimony from Dr. E. Kathleen Adams, a SRB staff health care economist. Dr. Adams conducted a study of 200 medical malpractice actions filed in Suffolk County. In conducting this study, she assumed that plaintiffs would take into account the increased "price" of proceeding to trial, i.e., the posting of the higher bond after an adverse ruling by the tribunal. Dr. Adams opined that in cases where the potential recovery was under $25,000, the increased cost of proceeding would possibly deter litigation. Although admittedly few claims in the study met these criteria, Dr. Adams estimated that there would be a .5% reduction in indemnity and up to 1% savings effect on rates. Additionally, JUA defense attorney Mr. Douglas Danner testified that he saw some "slight improvements" as a result of the increased bond amount. The Commissioner found the expert testimony

---

[8] General Laws c. 231, § 60B, previously mandated the posting of a $2,000 bond per defendant under the same circumstances.

persuasive and concluded that a one percent rate reduction was warranted in light of the deterrent effect of the increased tribunal bond amount. We affirm the Commissioner's decision on this issue.

JUA insists that the rate reduction was not supported by substantial evidence. JUA chooses to focus on the not-yet-existing empirical data to the exclusion of expert opinion. Given the short period of time since the enactment of the statutory change, it was unavoidable that the Commissioner would be presented with little evidence of actual experience with the increased bond amount. Whenever legislative reforms are put into effect, empirical data will be minimal during the early stages of implementation. However, this reality should not preclude the Commissioner, the administrator responsible for determining the effects of such statutory changes, from relying on credible expert testimony which supports a reasonable conclusion. The Commissioner's determinations must occasionally rest on reasoned judgment and prediction rather than pure fact. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 389 Mass. 824, 844 (1983).

E. *Blue Shield's contributory share.* In a related action consolidated with this case for appeal, MMS objects to two post-decision orders issued by the hearing officer and affirmed by the Commissioner regarding the calculation of the total medical malpractice adjustment amount (TMMA) to be recouped by physicians pursuant to G. L. c. 175A, § 5B.

Physicians in Massachusetts are prohibited by statute from reflecting increases in the costs of their practice due to elevated medical malpractice insurance premium rates in their charges to Blue Shield and governmentally subsidized patients. G. L. c. 176B, §§ 6, 7. Chapter 175A, § 5B, provides that Blue Shield increase its payments to physicians to offset a share of the total dollar increase in medical malpractice insurance premium charges over the charges in effect prior to the rates set in the 1986 decision.[9] This "pass-through" provision is designed

---

[9] Chapter 175A, § 5B, seventh par. defines Blue Shield's contributory share as: "The total adjustments shall be sufficient to generate, over a twelve-month period, additional payments to physicians or dentists equal

to mitigate the impact of heightened malpractice insurance expenses resulting from increased premium rates, and shift a percentage of these costs from doctors to Blue Shield policy-holders.[10]

The sole issue presented in this portion of MMS's appeal is how to measure the "total dollar increase in medical malpractice insurance premium charges" (TMMA) to which Blue Shield's subscribers must contribute. The MMS claims that TMMA should amount to the difference between the gross charges collected by JUA at the existing rates, and those collected after the 1986 rate year increases. Under this method of calculation, TMMA would include increases attributable to underlying changes in the number of doctors covered, physicians' choices to purchase different types of coverage, and increases or de-creases in the dollar limits of the coverage that doctors elected to buy.

Blue Shield, an intervener in this action, argues that the statute directs that TMMA should be calculated by simply repricing the 1983 experience at the new 1986-1987 rates, holding the number of doctors and the types of policies they held at constant levels. With the exception of a minor adjust-ment (to which Blue Shield does not object), the Commissioner agreed with Blue Shield's method of calculation. We affirm.

---

to the total dollar increase in medical malpractice insurance premium charges over the charges which were in effect prior to the decision to fix and establish new premium charges, multiplied by the following fraction: (a) The numerator shall be the per cent of total revenues for physicians, or dentists, which the medical service corporation's payments for services subject to the limitations of section seven of chapter one hundred and seventy-six B constitute, plus one-half of the per cent of total revenues for physicians, or dentists, paid by health insurance under Title XVIII of the Social Security Act; and (b) The denominator shall be one hundred per cent minus the per cent of total revenues for physicians, or dentists, paid by the medical service corporation under policies providing supplemental coverage to health insur-ance under Title XVIII of the Social Security Act. In the event that medical malpractice insurance premium charges decrease, negative adjustments shall be made pursuant to the same formula."

[10] Paragraph 10 of § 5B requires the Commissioner to authorize Blue Shield to increase its subscribers' health care insurance rates to cover com-pletely the cost of its contributory share.

The duty of statutory interpretation is for the courts, *United States Jaycees* v. *Massachusetts Comm'n Against Discrimination,* 391 Mass. 594, 600 (1984), but an administrative agency's interpretation of a statute within its charge is accorded weight and deference. See *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 116 (1978). Where the Commissioner's statutory interpretation is reasonable, and his findings are supported by substantial evidence, the court should not supplant his judgment. *Insurance Rating Bd.* v. *Commissioner of Ins.,* 359 Mass. 111, 117 (1971).

In his final calculation of TMMA, the Commissioner did not adjust for annual variations in the number of physicians insured because "the total doctor count was highly contested by expert actuaries" at the hearing. The Commissioner decided, rather, to adopt a synthetic figure based on an averaged three-year physician population. In light of his finding that the "expert disagreement on the record was so strong," the Commissioner's approach was entirely reasonable. See *Attorney Gen.* v. *Commissioner of Ins.,* 370 Mass. 791, 798-799 (1976).

The Commissioner's decision not to reflect JUA revenue increases resulting from changes in the purchasing patterns of insured physicians was based on a reasonable construction of c. 175A, § 5B. The specific language of that statute directs that the calculation of Blue Shield's contributory share be based on the "total dollar increase in medical malpractice insurance premium charges over the charges which were in effect prior to the decision to fix and establish new premium charges." G. L. c. 175A, § 5B, seventh par. The Commissioner's exercise of authority to "fix and establish" premium rates affects increases in rate levels alone. These rate increases are quite independent of premium fluctuations caused by the voluntary purchasing choices of physicians, such as decisions by doctors to practice in partnerships or corporations, to shift between claims made and occurrence policies, to purchase reporting endorsements, or to change the policy limits of their coverage. The Commissioner's decision to exclude factors extraneous to the fixing and establishing of rate levels was entirely reasonable. Had the Legislature intended Blue Shield and its subscrib-

ers to subsidize a portion of these voluntary expenditures, it could have provided for a pass-through of increases in "total malpractice insurance revenues," but it did not. Conversely, in paragraphs three and four of § 5B, the Legislature did use the term "total revenues" to describe a gross sum figure separately considered under the statute. We are guided by the rule of statutory construction that "where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present." *Beeler* v. *Downey,* 387 Mass. 609, 616 (1982). We do not believe it is proper for us to read § 5B as requiring Blue Shield to contribute to total JUA revenue increases, especially when such an interpretation would require Blue Shield subscribers to contribute to costs of practice that are voluntarily incurred by physicians.

In calculating TMMA, the Commissioner did, however, recognize annual changes in the distribution of doctors among risk classifications.[11] In the Final Implementation Order, the Commissioner reasoned that "[i]t is necessary to distinguish among risk-classifications in pricing current increases because aggregate costs are sensitive to the distribution of doctors among the risk-classifications, and because the risk-classifications themselves have changed since the base year, from which the increases are computed." The Commissioner's decision to reflect distributional changes in risk classes was reasonable and in compliance with the statutory requirement that "total adjustments shall be sufficient to generate, over a twelve-month period, additional payments to physicians . . . equal to the total dollar increase in medical malpractice insurance premium charges." G. L. c. 175A, § 5B, seventh par. We find no error.

F. *Conclusion.* These cases are remanded to the single justice, who is to order entry of a judgment reversing the decision of the Commissioner and directing him to adjust, as necessary, his calculation and apportionment of total deferred premium

---

[11] Although Blue Shield's reading of the statute would not authorize such an adjustment, its effect was so insubstantial that Blue Shield "chose not to appeal from this minor disagreement."

liability and his calculation of rate reductions to reflect antici-
pated savings, in accordance with this opinion.

*So ordered.*