## JOHN T. CALLAHAN & SONS, INC., & others[1] *vs.* CITY OF MALDEN & another.[2]

Middlesex. April 5, 1999. - July 22, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Contract,* Construction contract, Bidding for contract. *Public Works,* Bidding procedure, Project labor agreement. *Practice, Civil,* Standing. *Injunction.*

Certain nonunion contractors, who alleged that they each would have prepared and submitted bids on a public works project in the city of Malden but for the requirement, as a condition of being awarded a contract, of signing a project labor agreement, had standing to object to the bidding process in an action brought in the Superior Court. [129-130]

This court concluded that, in limited circumstances in which a public works project is of sufficient size, duration, timing, and complexity, the use of a project labor agreement (PLA) does not violate the competitive bidding statute, G. L. c. 149, §§ 44A-44H, and, if challenged, the awarding authority must demonstrate a record of a careful, reasoned process determining that the adoption of the PLA furthers the goals of the competitive bidding statute. [131-133]

The city of Malden undertook a public works project of sufficient size, duration, timing, and complexity to justify the use of a project labor agreement (PLA) to which all bidders on the project, union or nonunion, were required to subscribe [133-136], and, when the bidding process was challenged in a civil proceeding, the city carried its burden of demonstrating a record of a careful, reasoned process to determine that the adoption of the PLA furthered the goals of the competitive bidding statute [136-138].

A judge of the Superior Court did not abuse his discretion in denying a request for a preliminary injunction by certain nonunion contractors seeking to prohibit the city of Malden's use of a project labor agreement as part of their challenge to the bidding process in a large public works project, where the plaintiffs showed no reasonable likelihood of success on their claims. [130-131, 138]

CIVIL ACTION commenced in the Superior Court Department on November 19, 1997.

[1]Enterprise Equipment Co., Inc.; Methuen Construction Co.; Annese Electrical Services, Inc.; The Chappy Corporation; Wayne J. Griffin Electric, Inc.; and LeVangie Electric Co., Inc.

[2]Building Trades Council of the Metropolitan District, AFL-CIO, intervener.

A motion for preliminary injunctive relief was heard by *Hiller B. Zobel,* J.

A request for interlocutory review was considered in the Appeals Court by *Mel L. Greenberg,* J. The Supreme Judicial Court transferred the case on its own initiative.

*Edward F. Vena* for the plaintiffs.

*William G. Meserve* (*Richard J. Lettieri* with him) for city of Malden.

*Donald J. Siegel* for the intervener.

*James L. Rudolph, James S. Singer, & Gustavo A. del Puerto* for Associated Builders and Contractors of Massachusetts, Inc., amicus curiae, submitted a brief.

*James A. Sweeney,* Assistant Attorney General, for the Commonwealth, submitted a brief.

MARSHALL, J. At issue in this case is whether the competitive bidding statute, G. L. c. 149, § 44, permits the city of Malden (city or Malden) to require all successful bidders on a public works project to sign a project labor agreement (PLA) as a condition of being awarded a contract.

The plaintiffs, seven nonunionized contractors who object to the requirement that they abide by the PLA negotiated between the city and numerous unions, filed suit in the Superior Court on November 19, 1997, claiming that Malden's solicitation of bids and award of construction contracts for two public school building projects violated the competitive bidding statute, G. L. c. 149, §§ 44A-44E, 44G, and 44H, by requiring a successful bidder to sign the PLA. The plaintiffs sought declaratory and injunctive relief. On December 1, 1997, a judge in the Superior Court allowed the motion of the Building Trades Council of the Metropolitan District, AFL-CIO, to intervene as a defendant and denied the plaintiffs' request for a preliminary injunction. On December 11, 1997, the plaintiffs filed an appeal in the Appeals Court from that order. The plaintiffs simultaneously filed a petition for interlocutory relief pursuant to G. L. c. 231, § 118, first par., see *Ashford* v. *Massachusetts Bay Transp. Auth.,* 421 Mass. 563, 567-568 (1995), which a single justice of the Appeals Court denied without a hearing on January 13, 1998. We transferred the case here on our own motion. We conclude that the competitive bidding laws of this Commonwealth are not an absolute bar to project labor agreements in public construction contracts, and that in the circumstances of this case the judge

did not abuse his discretion in denying the plaintiffs preliminary injunctive relief.

1. *Facts.* Malden has undertaken a $100 million project to replace over a five-year period all of its kindergarten through sixth grade schools (the project). The city will close nine existing schools, demolish three of them, and build five new schools to serve all kindergarten through eighth grade students.[3] In October, 1996, the city engaged O'Brien-Kreitzberg, Inc. (O'Brien), to be the construction program manager for the project. As part of its contract with the city, O'Brien analyzed the various construction and procurement methods available to enable Malden to complete the project on budget, on schedule, and with reduced long-term operation and maintenance costs. The PLA is a component of the construction and procurement method selected by Malden on the recommendation of O'Brien.

To that end, Malden negotiated the PLA with the Building and Construction Trades Council of the Metropolitan District, AFL-CIO, and the New England Council of Carpenters, AFL-CIO (unions).[4] The PLA requires each contractor on the project to recognize the unions as the "sole and exclusive bargaining representative[s] of all craft employees" working on the project. A contractor may employ only employees referred through the union hiring halls. The PLA mandates that this referral system be operated in a manner that is nondiscriminatory to nonunion workers, consistent with Federal law. Wages are determined according to the Massachusetts Department of Labor and Industries prevailing wage schedule and shall remain consistent throughout the duration of the project. Contractors must contribute to established union employee benefit funds, and comply with uniform work schedules, holidays, work assignments, and overtime provisions as set out in the PLA. The PLA imposes a uniform dispute resolution system, and prohibits

---

[3]Malden serves between 4,400 and 4,600 kindergarten through eighth grade students. Seventh and eighth grade students are currently located in a portion of the city's high school.

[4]The PLA is between "O'Brien-Kreitzberg, Inc. as Construction Program Management Consultant . . . for the City of Malden . . . and the Building and Construction Trades Council Metropolitan District, AFL-CIO and the New England Council of Carpenters . . . on behalf of their affiliated Local Unions and signatory Local Unions, each acting on its own behalf and on behalf of its respective affiliates and members." Fifteen local unions are signatories to the PLA.

strikes, picketing, work stoppages, slowdowns, lockouts, and any other disruptive activity during the life of the project.

After the city negotiated the PLA, the mayor presented it to the Malden municipal building committee (committee). The committee is charged with the over-all administration of the project, and is the awarding authority for the project's construction contracts.[5] On May 6, 1997, the committee approved by resolution the execution of the PLA. O'Brien, on behalf of the city, and the unions executed the PLA on June 27, 1997.

In the first phase of the project, Malden issued separate invitations to bid to general contractors for the construction of the first two schools, Beebe and Roosevelt Park, on October 20, 1997. Each invitation stated that the project was subject to the PLA, a copy of which was included in the bid documents.[6] General Laws c. 149, § 44B (2), requires each bidder on a public works project to submit a bid security in an amount equal to five per cent of the value of its bid. Malden requires the successful low bidder on each project to sign the PLA, agreeing to be bound by its terms, as a condition of being awarded the contract. A refusal by a successful bidder to sign the PLA constitutes a refusal to execute the contract. Under the statute, a successful bidder who does not execute a contract forfeits its bid security in an amount equal to the difference between its bid and the bid of the ultimate contractor, up to the entire amount. G. L. c. 149, § 44B (3).

The plaintiffs are all nonunion, or open-shop, contractors who engage in a substantial amount of business in the public sector. Each alleges that it would have prepared and submitted bids for both projects but for the PLA.

2. *The competitive bidding statute.* General Laws c. 149, §§ 44A-44H, provide comprehensive and detailed requirements for public agencies that award building contracts costing more than $25,000. G. L. c. 149, § 44A (2). Section 44A (2) provides that contracts "shall be awarded to the lowest responsible and

[5]Chaired by the mayor, the committee is comprised of elected and appointed voting members and citizen participants.

[6]Malden originally issued an invitation to bid on the two schools as a single project in May, 1997. This original invitation also stated that the project was subject to the PLA. The PLA had been approved by the committee, and its subsequent execution was anticipated. Malden rejected all of the first bids because the lowest exceeded the budget. After redesigning certain aspects of the project, the city issued new invitations to bid on each school separately.

eligible general bidder on the basis of competitive bids." Section 44A (1) defines "responsible" as "demonstrably possessing the skill, ability and integrity necessary to faithfully perform the work called for by a particular contract, based upon a determination of competent workmanship and financial soundness." G. L. c. 149, § 44A (1). To be "[e]ligible," a bidder must meet certain statutory requirements and "certify that he is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work." This latter provision is referred to as the "labor harmony clause."

"We construe G. L. c. 149, §§ 44A-44[H], as we must, in the light of the legislative objectives which were served by its enactment so as to effectuate the purpose of the framers." *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 757 (1975). The purpose of competitive bidding statutes is transparent: "to ensure that the awarding authority obtain the lowest price among responsible contractors" and "to establish an open and honest procedure for competition for public contracts." *Modern Cont. Constr. Co.* v. *Lowell*, 391 Mass. 829, 840 (1984), citing *James J. Welch & Co.* v. *Deputy Comm'r of Capital Planning & Operations*, 387 Mass. 662, 666 (1982). There exist

> "two fundamental, complementary legislative objectives underlying the competitive bidding statute. First, the statute enables the public contracting authority to obtain the lowest price for its work that the competition among responsible contractors can secure. . . . Second, the statute establishes an honest and open procedure for competition for public contracts and, in so doing, places all general contractors and subbidders on an equal footing in the competition to gain the contract. The statutory procedure facilitates the elimination of favoritism and corruption as factors in the awarding of public contracts and emphasizes the part which efficient, low-cost operation should play in winning public contracts."

*Interstate Eng'g Corp.* v. *Fitchburg, supra* at 757-758.

The gravamen of the plaintiffs' complaint is that requiring all contractors to abide by the PLA violates the competitive bidding statute by effectively closing nonunion contractors out of the bidding process. They claim that to comply with the PLA, an open-shop contractor must run two companies — one union

and one nonunion — essentially reinventing as a union shop the part of the business that works on the project. Restricting competition, they allege, results in a bidding process that is not open and honest, does not put bidders on an equal footing, and does not yield the lowest possible price among responsible contractors. The plaintiffs also claim that the competitive bidding statutes essentially preempt public awarding authorities from determining, beyond the statutory requirements, how public contracts are bid and awarded. The PLA, they allege, unlawfully goes beyond the requirements of the labor harmony clause, and exceeds the statutory power of the awarding authority.

3. *Standing*. The defendants first claim that the plaintiffs have no standing to object to the bidding process because they did not file bids on either project and therefore have suffered no legal harm. We reject this argument.

In *Modern Cont. Constr. Co.* v. *Lowell, supra* at 835, we stated:

> "It is well established that parties challenging compliance with the bidding procedures set forth in G. L. c. 149, §§ 44A-44H, need not meet rigid 'but for' standing requirements by asserting that if there had been compliance with the statute, they certainly would have been awarded the contract. The challenging party need show only that it possessed the potential to obtain the award. . . . If the situation were otherwise, the important role played by individual bidders in securing compliance with the bidding statutes and legislative policy objectives would be diminished."

The Appeals Court subsequently noted that it did "not think" that *Modern Cont. Constr. Co.* v. *Lowell, supra,* and *Quincy Ornamental Iron Works, Inc.* v. *Findlen,* 353 Mass. 85 (1967), "indicate that an action in Superior Court would be barred to one who was illegally prevented from becoming a bidder on equal terms with others." *Doric Bldg. Assocs.* v. *Department of Labor & Indus.,* 27 Mass. App. Ct. 1175, 1177 (1989).[7] We agree.

---

[7] In *Doric Bldg. Assocs.* v. *Department of Labor & Indus.,* 27 Mass. App. Ct. 1175, 1177 (1989), the Appeals Court determined that the plaintiffs in that case had standing to file a bid protest with the Department of Labor and

Had any of the plaintiffs filed a bid, each would have been required to post a bid security equal to five per cent of its bid. G. L. c. 149, § 44B (2). Had any plaintiff been the low bidder and then refused to sign the PLA, it would have forfeited as a penalty an amount equal to the difference between its bid and that of the contractor ultimately selected, up to the entire amount of the bid security. G. L. c. 149, § 44B (3). Requiring a potential bidder to incur such a harsh financial penalty to gain standing to challenge the legality of the bidding process would undermine "the important role played by individual bidders in securing compliance with the bidding statutes and legislative policy objectives." *Modern Cont. Constr. Co. v. Lowell, supra* at 836.[8] The plaintiffs have standing to challenge the bid process in the Superior Court.

4. *Preliminary injunction.* "In reviewing a denial of a request for a preliminary injunction, we determine whether the judge abused his discretion. *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 615 (1980). '[W]hile weight will be accorded to the exercise of discretion by the judge below, [where, as here,] the order was predicated solely on documentary evidence we may draw our own conclusions from the record.' *Id.* at 616." *GTE Prods. Corp. v. Stewart,* 414 Mass. 721, 722 (1993). We "focus on whether the lower court applied the proper legal standard and whether the record reasonably supports the lower court's factual determinations." *T & D Video, Inc. v. Revere,* 423 Mass. 577, 580 (1996), citing *Packaging Indus. Group, Inc. v. Cheney, supra.* In this case, the judge denied the request for injunctive relief without explanation or "factual determinations." We therefore must determine whether, in our view, the record supports the denial of the preliminary injunction.

"[T]o issue injunctive relief correctly, a judge initially must

Industries. The Appeals Court distinguished *Modern Cont. Constr. Co. v. Lowell,* 391 Mass. 829, 835-836 (1984), and *Quincy Ornamental Iron Works, Inc. v. Findlen,* 353 Mass. 85, 87-88 (1967), because those cases involved standing to file an action in the Superior Court.

[8]In *Modern Cont. Constr. Co. v. Lowell, supra* at 836 n.9, we stated that we did "not wish to encourage the litigation of petty grievances by disappointed bidders; however, the tradition of according standing so long as a project bid has been submitted has strong support in our case law." We do not read this language as requiring the plaintiffs to incur a harsh financial penalty to gain standing to object to the legality of a bidding process, where, as here, the claim is directed to a claimed wholesale attempt to bypass the statutory requirements.

consider whether the plaintiff has demonstrated that without the relief he would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. [*Packaging Indus. Group, Inc.* v. *Cheney, supra*] at 617 n.11. The plaintiff also must show that there is a likelihood that he would prevail on the merits of the case at trial. The judge then must balance these two factors against the showing of irreparable harm which would ensue from the issuance, or the denial, of an injunction and the 'chance of success on the merits' presented by the defendant. *Id.* at 617. An injunction may issue properly only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweigh[s] the defendant's probable harm and likelihood of prevailing on the merits of the case." *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 87-88 (1984). Where the dispute does not involve private parties, "a judge is required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Id.* at 89.

We consider initially whether the use of a PLA violates the competitive bidding statute, G. L. c. 149, §§ 44A-44H. We accept for purposes of evaluating the denial of the preliminary injunction the plaintiffs' representation that they were inhibited from bidding, and that this inhibition could have anticompetitive effects.[9] See *George Harms Constr. Co.* v. *New Jersey Turnpike Auth.*, 137 N.J. 8, 44 (1994); *New York State Chapter, Inc.* v. *New York State Thruway Auth.*, 88 N.Y.2d 56, 65 (1996). The defendants counter that the PLA allows all contractors to bid equally. Although we may agree with the plaintiffs' contention that PLAs do have some anticompetitive effect, we nevertheless conclude that PLAs on public construction projects are not absolutely prohibited. Rather, in limited circumstances, described below, where a project is of sufficient size, duration,

---

[9]The plaintiffs claim that requiring nonunion contractors to abide by the PLA creates a loss of autonomy that inhibits them from bidding on those public projects that contain PLAs, thereby restricting competition. They point to: their inability to use their own workers and foremen, instead having to rely on workers assigned by the union hiring halls who are "unknown and hostile to non-union companies"; their inability to manage their own jobs based on their established work rules; their inability to contribute to their own employee health, welfare, pension, and other benefit plans; and their inability to use their own apprentices. The plaintiffs also claim that forcing them to be bound to unions who are traditionally hostile to them similarly restricts competition.

timing, and complexity, their use is consistent with the purposes of the competitive bidding statute, notwithstanding the resulting interference with competition.

We are persuaded by the reasoning of the Court of Appeals of New York in *New York State Chapter, Inc.* v. *New York State Thruway Auth., supra.* That case involved a four-year project to refurbish the Tappan Zee Bridge, the largest project undertaken on the bridge since it opened in 1955.[10] The court concluded that PLAs are permissible where the awarding authority shows "that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statute." *Id.* at 69. The purposes of the New York competitive bidding statute, "(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts," *id.* at 68, are similar to the purposes of the Massachusetts competitive bidding statute. See *Interstate Eng'g Corp.* v. *Fitchburg,* 367 Mass. 751, 757-758 (1975). The court concluded "[t]he Thruway Authority's detailed focus on the public fisc — both cost savings and uninterrupted revenues — the demonstrated unique challenges posed by the size and complexity of the project, and the cited labor history collectively support the determination that this PLA was adopted in conformity with the competitive bidding statutes." *New York State Chapter, Inc.* v. *New York State Thruway Auth., supra* at 71. See *Associated Bldrs. & Contrs., Inc.* v. *Southern Nev. Water Auth.,* 979 P.2d 224 (Nev. 1999).

We agree with this formulation. When an awarding authority's use of a PLA is challenged, the authority bears the burden of demonstrating that it adopted a PLA to further the purposes of the competitive bidding statute — obtaining the lowest price that competition can secure and placing all contractors on an equal footing, *Interstate Eng'g Corp.* v. *Fitchburg, supra* at 757-758 — as well as to meet the statutory requirement of promoting labor harmony. A challenge to a particular project will be sustained unless the record supporting the awarding

---

[10]The total dollar value of the project is not stated, but a consultant's report cited in the opinion stated that adopting a PLA would result in savings of $6 million, or 13.51% of the anticipated labor cost. *New York State Chapter, Inc.* v. *New York State Thruway Auth.,* 88 N.Y.2d 56, 70 (1996). Based on these figures, the labor costs alone were anticipated to be in excess of $44 million.

authority's determination to enter into a PLA establishes that such an agreement was justified by the interests underlying the competitive bidding laws. See *Associated Bldrs. & Contrs., Inc. v. Southern Nev. Water Auth., supra* at 227. In other words, a PLA will not be upheld unless (1) a project is of such size, duration, timing, and complexity that the goals of the competitive bidding statute cannot otherwise be achieved and (2) the record demonstrates that the awarding authority undertook a careful, reasoned process to conclude that the adoption of a PLA furthered the statutory goals.

In support of their application for injunctive relief, the plaintiffs submitted only identical three-page affidavits. The affidavits consist primarily of conclusory statements, such as "[b]ased upon my review of the plans and specifications for the Salem Street and Pleasant Street schools, I have determined that each is a routine public construction project, the likes of which are bid and performed regularly throughout the Commonwealth." In response, the city submitted, among other documents, a thirteen-page affidavit from E. Scott Sumner, a vice-president and principal in charge of O'Brien's Boston office and the over-all program manager for the Malden Schools project, and a thirteen-page affidavit from the mayor of Malden. The defendants also submitted a resolution of the city of Malden municipal building committee authorizing a PLA for the school construction program, and a press release describing the mayor's announcement of the adoption of the PLA.

Read together, the city's submissions establish that the adoption of the PLA in this case meets the standards we described above: the project is of sufficient size, duration, timing, and complexity to justify the use of a PLA, and the city engaged in a careful process to conclude that the PLA's adoption would further the purposes of the competitive bidding statute. The two schools at issue in this case are part of a comprehensive, $100 million, five-year program to close nine existing schools, to demolish three of them, and to build five new schools. The city describes the school project as "a carefully choreographed dance," in which even a slight delay would have severe consequences because the project "encompasses demolition of existing schools that are currently being utilized, replacement of the demolished schools with new school buildings, coordination of construction/demolition activities at multiple sites and adoption and maintenance of an interdependent phasing of construc-

tion milestones and school openings and closings."[11] Approximately 4,000 students, their classrooms, and their teachers will be relocated, over a number of years, in what of necessity must be a carefully synchronized fashion. To provide time for teachers, students (and their parents), and administrators to become familiar with the new school buildings, and to allow sufficient time for equipment and supplies to be moved, new schools are scheduled to be completed during June or July of the summer prior to their opening.[12]

---

[11]The mayor's affidavit contains the following explanation of the schedule:

> "*Roosevelt Park* will be constructed on a portion of the existing Roosevelt Park site. Upon Roosevelt Park's opening, two existing schools will close.

> "*Beebe* will be constructed at the former Beebe Junior High School site. Upon Beebe's opening, an additional two existing schools will close.

> "*Newman Park* will be constructed on a portion of the existing Newman Park site. Upon Newman Park's opening, two more existing schools will close.

> "*Forestdale* will be constructed at the existing Forestdale School site.

> "*Linden* will be constructed [at] the existing Linden Elementary School site, combined with a portion of the adjacent Huntington Field Park site."

[12]As an example of how even a slight delay in the schedule would have an impact on the project, Mr. Sumner stated in his affidavit that "[i]f *all* of the first three schools are not opened by September, 1999, two of the existing inadequate schools . . . must remain open for the duration of the 1999-2000 school year. This will result in . . . further delay in the construction of the two remaining replacement schools which cannot be constructed until the existing inadequate facilities are demolished." (Emphasis in original). He also stated that "[a]ny delay in the construction of the two school projects that are the subject of this case will have serious adverse short term and long term impacts on the school children in Malden. Both of the schools at issue in this case require a construction start in January, 1998, in order to ensure completion to allow for school openings in September, 1999. If the construction is delayed by even 4-6 weeks (which will be the case if a new bid process is required), the school openings may be delayed for up to a full academic year. This is because: a minimum of 4 to 6 weeks following construction completion is necessary for operational shakedown and assurances of indoor air quality; 6-8 weeks will be required to provide for the transition in operations as

Mr. Sumner further stated that a one-year delay, see note 12, *supra*, could be expected to result in an estimated four to six per cent increase in costs, totaling $3.4 to $5.1 million. Such a delay would also necessitate an additional $1 million expenditure for administrative management and redesign fees. Accounting for these additional costs while still remaining within the budget would in turn necessitate reducing the project by 29,000 to 43,000 square feet of space, thereby reducing by 190 to 281 the number of students the project could accommodate.

The PLA's provision prohibiting work stoppages is critical to the "dance." According to the mayor, at least twenty-five labor contracts will expire over the course of the project, making the city particularly vulnerable to delays from labor unrest.[13] Although the record does not reflect any recent labor disputes in Malden, the affidavits of both Mr. Sumner and the mayor cite the delay caused by a recent labor dispute between union and nonunion contractors on a Suffolk County court house project.[14] Cf. *New York State Chapter, Inc.* v. *New York State Thruway Auth.*, *supra* at 75 (record did not demonstrate labor unrest threatening particular project). The mayor stated that the inability of the labor harmony clause in and of itself to prevent that labor dispute demonstrated to him that the school project required the additional protection of the PLA to avoid a similar dispute: "In my discussions with labor representatives, it became clear to me that the only mechanism available for ensuring *no disruptions* to the Malden Schools Program would be a Project Labor Agreement" (emphasis added). By entering into the PLA, the city sought to obtain commitments that are consistent with but exceed the protection of the labor harmony

---

well as relocation of retained equipment; and a substantial period of time must also be allowed to prepare the entire community — school operations personnel, teachers, students, parents — to make the adjustments required in occupying entirely new school buildings. The current construction schedule takes into account all of these factors while allowing Beebe and Roosevelt Park school openings *at the beginning* of the 1999 school year" (emphasis in original). We recognize that Mr. Sumner addressed this portion of his affidavit to the delay caused by the litigation and any possible requirement of reopening the bidding process. He states that the results would be the same for a delay caused by a work stoppage.

[13]The record is not clear as to what twenty-five contracts these are. The statement is contained in the mayor's press release, made prior to the award of any contracts on the project.

[14]In his press release, the mayor also referred to a delay in the construction of a shopping mall in Revere due to "picket lines and demonstrations."

clause: an agreement that there be *"no* disruptions" to the school building program.[15]

We do not articulate a bright-line, litmus-test standard for determining when the use of a PLA is appropriate. Nor do we conclude that a PLA will be justified in all, or even most, circumstances. A project must be of substantial size, duration, timing, and complexity, and the interplay between all four of these factors must be considered. It may be that, in certain cases, the sheer size of a project warrants the adoption of a PLA. In most circumstances, the building of a single school will not, in and of itself, justify the use of a PLA. Our conclusion here relies on our recognition that the timing of this project, given its size, duration, and complexity — the "carefully choreographed dance" — makes a PLA necessary to assure the completion of the project on time, within budget, and on a schedule which provides students, parents, teachers, and school administrators the time necessary to make all the required, complicated transitions.

The record also demonstrates that the city undertook a careful, reasoned process to determine that the adoption of the PLA furthers the goals of the competitive bidding statute. The city engaged O'Brien to analyze and evaluate various strategies and methods of construction and procurement to address the complexities of the program, and one component was the PLA. The mayor presented the proposed PLA to the municipal building committee, which adopted it by resolution at a meeting.[16]

The PLA at issue furthers the goals of the competitive bidding statutes: the record demonstrates that these purposes motivated the city's adoption of the PLA. First, the record reflects that the city sought to "obtain the lowest price for its work that the competition among responsible contractors can secure." *Interstate Eng'g Corp.* v. *Fitchburg,* 367 Mass. 751, 757 (1975). A key feature of the PLA is that it sets the wages

---

[15]The PLA also furthers the statutory requirement of labor harmony by implementing uniform work rules, schedules, and means for dispute resolution, including jurisdictional disputes, thereby minimizing the potential for conflict between workers employed by various contractors.

[16]The record does not reflect the duration or content of the committee's deliberation prior to the adoption of the PLA, nor the content or scope of any material submitted to the committee prior to its deliberation. A cursory "rubber stamp" by such an authority will be insufficient to withstand a challenge to the adoption of a PLA. See *New York State Chapter, Inc.* v. *New York State Thruway Auth., supra* at 74-75.

paid under the contract to the minimum hourly rates required by the Department of Labor and Industries prevailing wage schedule, as opposed to various (presumably higher) collective bargaining rates, for the duration of the contract. Mr. Sumner stated that the wage provision of the PLA not only helped to maintain low costs, but also allowed all prospective bidders to calculate their labor costs with the same degree of certainty, producing "more accurate bidding and better prices." This provision furthers the purpose of obtaining "the lowest price for its work that competition among responsible contractors can secure," and serves to "place[] all general contractors and sub-bidders on an equal footing in the competition to gain the contract." *Id.* at 757, 758.

The plaintiffs contend that requiring nonunion contractors to sign the PLA necessarily operates to discriminate against nonunion contractors in contravention of the statutory goals. Although the PLA at issue requires that any employees who work on the project be referred to the contractor by the union hiring halls, the PLA specifically mandates that the "job referral system must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements." We are not blind to the realities of the tensions between union and nonunion workers, and the potential exacerbation of that tension by the requirement that every contractor employ only employees referred through the union hiring hall. The commitment of signatories to the PLA to operate any job referral system in a nondiscriminatory manner is a binding commitment that may be judicially enforced.

O'Brien also serves as the program manager on the Massachusetts Port Authority's "Logan 2000 Program" and has entered into a PLA in that project identical to the one at issue here with respect to the requirements that all contractors be bound by the PLA and that all employees be referred by the union hiring halls. The statistics contained in his affidavit indicate that twenty-five out of 139, or almost 18%, of contracts worth $123 million have been awarded to nonunion contractors on the Logan 2000 Program. These statistics led O'Brien to conclude that the same requirements in the Malden PLA would

not serve to "unduly limit competition during the contractor selection bidding process." "Statutory bidding procedures are designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally." *Phipps Prods. Corp. v. Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 691-692 (1982). The information indicates that those statutory goals are being met under a similar PLA on another project. Although requiring all contractors to abide by the PLA may make bidding on projects less attractive to nonunion contractors, the requirement does not prevent them from bidding on, and being awarded, public contracts.

5. *Conclusion.* The defendants have demonstrated, preliminarily, that the Malden schools project is of sufficient size, duration, timing, and complexity to justify the use of a PLA, and that the city undertook a careful, reasoned process before concluding that the adoption of a PLA in these circumstances furthered the statutory goals of open and honest competition and of promoting labor harmony. The plaintiffs, therefore, demonstrated no reasonable likelihood of success on the merits of their claim. The judge did not abuse his discretion in denying the preliminary injunction. We affirm the judge's denial of the plaintiffs' request for a preliminary injunction.

*So ordered.*