Hinkle, J.
In this action for declaratory relief, plaintiffs allege defendants are in violation of the competitive bidding statute with regard to the planned construction of an 800-bed dormitory at the University of Massachusetts Dartmouth campus. Defendants assert they proceeded lawfully under a 1998 amendment to an enabling statute. The matter is now before this court on plaintiffs’ request for injunctive relief preventing construction from beginning. I treat this as a request for a temporary restraining order.[3] After a nonevidentiary hearing, for the reasons discussed below, plaintiffs’ request is DENIED.
BACKGROUND
The following facts are taken from the complaint (the facts of which are “affirmed” by an affidavit of counsel) and the August 22, 2001 affidavit of Joseph G. Brady, Executive Director of defendant University *623 of Massachusetts Building Authority. As no evidentiary hearing was held, I of course do not find any facts.
Plaintiff Associated Subcontractors of Massachusetts, Inc. (“Associated”), is a Massachusetts nonprofit corporation whose members bid on public building projects in the Commonwealth. Plaintiffs Montle Plumbing & Heating Co., Norfolk Electric, Inc. and Apex Corp. are members of Associated and bid on public building work in Massachusetts as subbidders. Defendants University of Massachusetts Building Authority (the “Authority") and the University of Massachusetts (the "University”) have undertaken a project to construct an 800-bed residence hall (the “dormitory project” or the “project”).
On or about December 21, 2000, counsel for the Authority wrote the Governor to request his approval “to use alternative modes of procurement of construction services.” The letter states: “It is the intention of the Authority to acquire, through a public process, the services of a Design-Build firm . . . More than fifty percent of the cost of the project will be financed by fees for room and board paid by University students.”
By letter dated February 13, 2001, the Governor responded, in relevant part, as follows:
I agree that the fees for room and board paid by University students constitute nongovernmental sources of revenue for the project you have described and that, with the approval of this office, the Authority is permitted to use an alternative mode of procurement of design and construction pursuant to [St. 1960, c. 773, §18).
I have reviewed the procurement method which you submitted to this office and hereby approve the same.
By letter dated Feb. 27, 2001, counsel for the Authority informed the Governor that although the Authority had originally stated it “intended to use a Design-Build firm for the project” it might “employ a Design-Build team consisting of an independent designer and a construction manager.” The letter states that no response is necessary, and the Governor did not respond.
On or about April 25, 2001, the Authority issued a Request for Proposals (“RFP”) which sought a construction manager for the project. The RFP was posted in the Boston Globe and in the Central Register of the Commonwealth. The RFP, along with copies of the design documents, were made available to Dodge Reports and Construction Market Data. Proposals were due May 18, 2001. At least three proposals were received in response to the RFP. The three proposers were interviewed on or about May 30, 2001, and additional information was requested.
On or about July 27, 2001, the Authority offered the management contract to Suffolk Construction (“Suffolk”). After revisions, the contract was sent to Suffolk on or about Aug. 9, 2001, and Suffolk subsequently executed the contract. The Authority signed the contract on Aug. 20, 2001.[4]
This action was filed on Aug. 20, 2001. The complaint seeks a declaration that the construction of the dormitory is in violation of the competitive bidding statute as well as. immediate injunctive relief, in the form of a temporary restraining order or a preliminary injunction, preventing defendants from proceeding with the construction until the declaratory judgment is ruled upon. Plaintiffs also ask that the University be enjoined from distributing, and the Authority be enjoined from receiving, funds constituting students’ room and board fees.[5]
The entire cost of the project is to be paid for by revenues received from room and board fees paid by students. More specifically, the Authority delivered facilities revenue bonds in the amount of $46,980,000 on January 8, 2001. The proceeds of the bonds are dedicated to the dormitory project. The bonds are to be paid using students’ room and board fees. The bonds include no Commonwealth appropriation. Brady Aff. at pars. 4-7.
The second phase of the project was scheduled to begin on Aug. 23, 2001. Pending completion of the dormitory, students will be tripled in dorm rooms in excess of the intended occupancy of those rooms. Defendants claim that delay of the project “would have materially adverse consequences for the project’s schedule and cost.” Brady Aff. at par. 17. In addition, “[i]f the Authority’s receipt of student fees is stopped, it would be unable to pay existing bonds.” Id.
DISCUSSION
The standard used to consider a request for a temporary restraining order is the same as that used for a preliminary injunction. Quincy Cablesystems, Inc. v. Sully’s Bar, Inc., 640 F.Sup. 1159, 1160 (D.Mass. 1986). In the context of G.L.c. 149, §§44A-44H, the competitive bidding statute, the standard for injunctive relief is as follows:
“[T]o issue injunctive relief correctly, a judge initially must consider whether the plaintiff has demonstrated that without the relief he would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. [Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 n. 11 (1980). ] The plaintiff also must show that there is a likelihood that he would prevail on the merits of the case at trial. The judge then must balance these two factors against the showing of irreparable harm which would ensue from the issuance, or the denial, of an injunction and the ‘chance of success on the merits’ presented by the defendant. Id. at 617. An injunction may issue properly only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweigh[s] the defendant’s probable harm and likelihood of prevailing on the merits of the *624 case.” Commonwealth v. Mass. CRINC, 392 Mass. 79, 87-88 (1984). Where the dispute does not involve private parties, “a judge is required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Id. at 89.
John T. Callahan & Sons, Inc. v. Malden, 430 Mass. 124, 130-31 (1999). See Modern Continental Constr. Co. v. Lowell, 391 Mass. 829, 837-38 (1984); Quincy Ornamental Iron Works, Inc. v. Findlen, 353 Mass. 85, 90 (1967).
On the record before the court, I conclude that plaintiffs have not sustained their burden of proving that they are likely to prevail on the merits of their claim.
Statute 1960, c. 773, is the act which established • the Authority.[6] The portion of that act most significant to this litigation is §18. As originally enacted, that section provided in relevant part: “The provisions of (G.L.c. 149, §§26-29 and 44A-44L], and the provisions of [G.L.c. 30, §§39F and 39G] are hereby made applicable to the Authority.” This paragraph of §18 was amended in 1998, replaced by the following:
The provisions of [G.L.c. 149, §§26-29 and 44A-44H], and [G.L.c. 30, §§39F-39P and §39R] are hereby made applicable to the authority. Notwithstanding the foregoing, for projects for which not less than one-half of the funds are from nongovernmental sources, with the approval of the governor, said authority may use an alternative mode of procurement of design and construction including, but not limited to, sequential, construction management, turnkey, design/build procurement and the phasing of such procurement including, but not limited to, approval of design and construction stages as separate or combined phases, which shall most efficiently, economically and best serve the interests of said authority. In all cases, said authority shall use procedures which shall be compatible with the policies and procedures for the selection of designers in [G.L.c. 7, §§38A 1/2 — 380] and with the policies and procedures for the selection of contractors in [G.L.c. 149, §§44A-44H] to the extent feasible in light of the mode selected.
St. 1960, c. 773, §18, as amended by St. 1998, c. 319, §15. Thus, the statute authorizes the Authority to avoid the competitive bidding statute and use alternative modes of procurement of design and construction when the stated conditions have been met.
Plaintiffs argue that the source of the funding for the dormitory project, student room and board fees, constitutes government or public funds. This is so, plaintiffs argue, because although the funds come from private persons, they are paid to satisfy a contractual obligation for room and board furnished to students by a public agency. Thus, according to plaintiffs, the money is public money because it is received by the public agency and is paid for a consideration. Because it is public money, plaintiffs argue, the Authority cannot claim the exception to the competitive bidding statute quoted above.[7]
As all parties correctly observe, there is no case law construing the phrase “governmental sources.” The parties have cited no legislative history, and this court’s research has found nothing helpful in the legislative history.[8] Defendants are correct that not all monies in the Authority’s possession are public monies simply because the Authority possesses them; the amendment contained in St. 1998, c. 319, §15 implies as much. I am therefore not persuaded by plaintiffs’ arguments that room and board fees are public funds simply because they are in the possession of the Authority.[9]
This is not to say, however, that the room and board fees are not government funds. The purposes of the competitive bidding statute include “facilitat[ing] the elimination of favoritism and corruption as factors in the awarding of public contracts and emphasiz[ing] the part which efficient, low-cost operation should play in winning public contracts.” Annese Elec. Servs., Inc. v. Newton, 431 Mass. 763, 767 (2000), quoting John T. Callahan & Sons, 430 Mass. at 128. It is indeed possible that the circumstances surrounding the use of room and board fees would lead to a conclusion that they do not constitute a “nongovernmental source.” Plaintiffs’ failure to satisfy me that they are likely to succeed on their claim is a failure to sustain their burden of proof at this stage of the litigation. The record before me establishes only that the dormitory project is to be funded by students’ room and board fees. Evidence, for example, that the defendants secured appropriations from the Legislature to compensate for use of room and board fees for construction might support plaintiffs’ argument that defendants are using “a ruse to avoid using competitive bids." Pls.’ Brief at 5. There is no such evidence before me.
Plaintiffs also request that defendants be ordered to answer the complaint within seven days. This request is allowed.
ORDER
For the foregoing reasons, plaintiffs’ request for injunctive relief, treated as a request for a temporary restraining order, is DENIED. Defendants shall answer the complaint within seven business days of the date this order is docketed.

 In their brief “In Support of Preliminary Injunction and Other Prayers” plaintiffs seek relief on prayer 3, which seeks a preliminary injunction. That prayer refers to prayers 1 and 2, which seek temporary restraining orders.

 Brady, who signed the contract on the Authority’s behalf, did not know at the time he signed the contract that this case had been filed. Brady Aff. at pars. 15-16.

 Although plaintiffs refer to this portion of their complaint in connection with their request for injunctive relief, plaintiffs *625 seem to have distanced themselves from this request to some degree. Pis.’ Brief at 4.

 The pertinent provisions of this act are reprinted as an appendix to chapter 75 of the General Laws in West Publishing Co.’s annotated compilation.

 Plaintiffs appear to be advancing another argument. This argument, as I read it, is as follows: the Authority sold bonds in the amount of $46,980,000 and “probably” pledged student room and board fees to pay for the bonds at maturity, the sale of bonds is a government function similar to securing funds by appropriation from the Legislature and “the securing of money by gift,” and the money is public money because ”[i]t is all a part of the revenues of the Authority to enable it to perform its governmental function.”

 Most of St. 1998, c. 319 makes appropriations for fiscal year 1998.

 Plaintiffs’ position regarding voluntary contributions is unclear. At one point in their brief, plaintiffs state: “Of course, when the public agency receives a voluntary contribution, that too becomes the property of the public agency but that is truly money received from a non-governmental source.” Pls.' Brief at 3. Later, plaintiffs state: ‘The sale ofbonds is just as much a governmental function as the security [sic] of money from appropriations and as the securing of money by gift.” Pls.’ Brief at 4.