Hely, Charles J., J.
A. Introduction
In 2008, the Town of Hingham conducted a bidding procedure for the construction of a new school. The project was a state assisted building project. Hingham awarded the general contract to the lowest bidder, CTA Construction Co., Inc. The plaintiff, Brait Builders Corp., was the second lowest bidder.
In a prior Superior Court action, Brait sought an injunction that would prohibit Hingham from awarding the contract to CTA. The application for an injunction was denied. CTA built the school. CTA’s construction of the school was substantially completed in July 2009.
In the present action, Brait seeks monetary damages from Hingham. Both counts in Brait’s complaint allege that Hingham violated the public bidding laws, G.L.c. 149, §§44A-44J, and G.L.c. 30, §39M, the minority and women business participation requirements of G.L.c. 7, §40N, and the Municipalities General Guidelines of the State Office of Minority and Women Business Assistance (“SOMWBA”). Brait’s specific violation-of-law argument is that Hingham allowed an untimely request by CTA for a reduction of the minority and women business participation goals. Brait also argues that Hingham allowed CTA’s goals reduction request without proper notice to Brait. Brait’s complaint seeks to recover from the town $2,150,000 in lost profit and bid cost damages.
Hingham is entitled to judgment as a matter of law. There is an absence of evidence that the contract award to CTA, the lowest bidder, violated any substantive statutory requirement. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711-12, 716 (1991).
B. Undisputed Material Facts
The facts stated in this decision are drawn from undisputed portions of the Mary Mahoney affidavit, the bid and contract documents and correspondence attached to the Mahoney affidavit, Hingham’s Interrogatory Answers, the Robert Brait affidavit, and the parties’ statement of facts.
(1) The Bid Documents and the SOMWBA General Guidelines
The 2008 bidding procedure for the school project was conducted by the Hingham School Building Committee and the Owner’s Project Manager, Mary Mahoney. Hingham distributed Bid Documents to pre-qualified general contractors including CTA and Brait. The portions of the Bid Documents that pertained to minority and women business participation goals were in the Invitation to Bid, Instructions to Bidders, and sections of the Contract for Construction Services and General Conditions (“the Contract”). Mahoney Aff. Ex. 2.
The Invitation to Bid and the Instructions to Bidders informed bidders that “before the contract award” the lowest general bidder would be required to provide the Owner with documentation stating how it intends to meet the minority and women business enterprise participation goals for the project. The Invitation to Bid and the Instructions to Bidders stated that the goal for minority business enterprise participation was 7.4% of the construction contract amount and that the goal for women business enterprise participation was 4% of the construction contract amount.
Neither the Invitation to Bid nor the Instructions to Bidders nor the Contract required general contract bidders to provide documentation with their bids on how the bidder intended to comply with the minority and women business participation goals. Instead, the Invitation to Bid and the Instructions to Bidders “strongly encouraged” general bidders and filed sub-bidders to include such documentation with their bids submissions.
Article 16 of the Contract was also included in the bid documents. Article 16 stated the same minority and women business participation goals as in the Invitation to Bid and the Instructions to Bidders. Article 16 refers to Appendix A to the Contract. Appendix A is the SOMWBA Municipalities General Guidelines of Januaiy 10, 2007 (“General Guidelines”).
The section of the General Guidelines relied on by Brait in this case is Attachment C, Section 9. This *446 section states that for contracts in which filed sub-bids are solicited requests by prospective general bidders to reduce the minority and women business participation goals “must be received by the Awarding Authority no later than five (5) working days after the list of filed sub-Bidders is mailed by the Awarding Authority to persons who have taken out plans for the Contract.” Attachment C, Section 9, of the General Guidelines states that the Awarding Authority “WILL NOT CONSIDER ANYREQUESTTO REDUCE OR WAIVE THE MBE/WBE PARTICIPATION GOALS FOR THIS CONTRACT THAT IS RECEIVED AFTER THESE DEADLINES."
Attachment C, Section 9, of the General Guidelines also states: “Any redaction or waiver of the MBE/WBE participation goals for this Contract will be made by written addendum mailed to all persons who have taken out plans for the project”
(2) CTA’s Waiver Request, Hingham’s Review of the Waiver Request, and the Award of the Contract
The filed sub-bids for the project were filed on March 5, 2008. In three of the sub-bid categories (masomy, waterproofing and plumbing), all of the sub-bids were rejected. At this point, because no filed sub-bids were accepted for these three trades, Hingham directed the general bidders to include in their general contract bid price allowances for these three trades totaling $3,610,000.
The bids for the general contract were submitted on March 26. CTA’s general contract bid of $21,295,000 was the lowest. Brait’s general contract bid of $21,748,000 was the second lowest.
On March 28, Hingham asked CTA to begin assembling documents and information to confirm the value of the work that CTA intended to subcontract to minority businesses and women businesses. Mahoney Aff. After the receipt of the general bids, Hingham asked CTA to submit its Schedule of Participation for minority and women businesses before Hingham decided whether CTA should be awarded the contract. Higham Int. Answer 6. Hingham also required CTA to provide it with information describing the extent of CTA’s pre-bid efforts to solicit interest for the project from minority and women business enterprises.
On April 4, Brait sent the Building Committee a bid protest letter formally protesting CTA’s bid. Mahoney Aff. Ex. 6. Brait’s letter contended that CTA’s bid should be rejected because CTA did not submit to the town its minority and women business enterprise Schedule of Participation within five days of the opening of the general bids.
On April 8, CTA sent the Building Committee a letter formally requesting a waiver in the form of a reduction of the minority and women business participation goals. CTA’s letter contained a detailed explanation of its good faith efforts to comply with the goals. In its April 8 letter and ensuing discussions with Hingham, CTA maintained that at the time of its general bid submission it had no control over the selection of subcontractors for the three trades for which filed sub-bids had been rejected. Mahoney Aff. Ex.; Hingham Int. Answer 6.
CTA pointed out that the available subcontract work for minority and women business participation was further reduced because a number of the subcontract trades had no viable SOMWBA certified subcontractors. CTA stated that it had directly solicited interest from approximately 365 SOMWBA certified subcontractors and 67 Blue Book minority and women subcontractors. CTA’s waiver request letter was accompanied by twenty-nine or so pages of documents to demonstrate its good faith efforts to obtain qualified minority and women subcontractors.
On April 10, the Building Committee rejected Brait’s bid protest. The Building Committee’s April 10 letter to Brait explained its reasons for rejecting the bid protest. Mahoney Aff. Ex. 6.
On April 11, CTA sent the Building Committee a letter with additional letters of intent for minority and women business participation in the project. CTA’s letter stated that at this point it had met the 7.4% and 4% minority and women business participation goals if the goal percentages were to be applied only to its proposed adjusted contract total of $17,685,000. CTA arrived at its proposed adjusted contract total by subtracting from its $21,295,000 bid price the $3,610,000 bid allowance for the three trades that were not available for identifying minority and women business participation at the time of the bid.
On April 17, CTA submitted to Hingham its Schedule for Participation by Minority/Women Business Enterprises for the contract. Mahoney Aff. Ex. 8. In this Schedule CTA certified that its minority business enterprise commitment was $1,309,400 and that its women business enterprise commitment was $730,240. These amounts would meet the 7.4% and 4% minority and women business participation goals if Hingham permitted CTA to apply the goal percentages to CTA’s proposed adjusted contract total of $17,685,000.
In the weeks between March 26 and April 23, Hingham reviewed CTA’s Schedule for Participation and its documents and statements regarding its efforts to comply with the minority and women business percentage goals. Hingham obtained from CTA the documentation it requested on CTA’s outreach to minority and women business enterprises. Hingham discussed with CTA various revisions to the Schedule for Participation. Hingham and CTA discussed at considerable length the reasons for CTA’s difficulties in meeting the minority and women business participation goals. CTA stated that the filed sub-bid process had only resulted in a few filed sub-bids from minority and women business enterprises. CTA also stated that *447 despite its outreach efforts, only a small number of minority and women business enterprises showed interest in working on the project. Mahoney Aff.; Hingham Int. Answer 6.
Hingham determined that CTA’s documents showed a considerable outreach effort by CTA. Hingham found that CTA had contacted several hundred minority and women businesses to determine their interest in submitting proposals for the project. Hingham carefully reviewed the problems CTA encountered in meeting the minority and women business percentage goals. Hingham determined that there was substantial merit to CTA’s request to apply the minority and women business percentage goals to CTA’s proposed adjusted contract amount. Hingham’s reasons for this conclusion included the $3,610,000 in allowances for the three trades with rejected filed sub-bids and the fact that CTA had no ability to select subcontractors for these trades. Hingham also relied on the limited number of filed sub-bidders who were minority or women business enterprises. Hingham determined that CTA had demonstrated to the Building Committee’s satisfaction that it had made a good faith effort to meet the minority and women business percentage goals for the project. Mahoney Aff.; Hingham Int. Answer 6.
On April 23, the Building Committee voted to approve CTA’s Schedule for Participation by Minority/women Business Enterprises. In its April 23 letter, the Building Committee acknowledged to CTA its receipt of letters of intent and current SOMWBA certifications for all contractors listed on CTA’s Schedule for Participation. Hingham accepted CTA’s Schedule for Participation and its minority business commitment of $1,309,400 and women business commitment of $730,240. Mahoney Aff. par. 39. Hingham did not send a copy of this letter or an equivalent addendum notice to Brait.
On May 7, the Building Committee awarded the construction contract to CTA. In its May 7 letter to CTA, the Committee stated that it had re-bid the three trades (masonry, waterproofing and plumbing) for which it had rejected earlier filed sub-bids. The Building Committee informed CTA that as a result of the re-bid process it had selected subcontractors for these trades with subcontractor amounts totaling $3,843,000. Mahoney Aff. Ex. 11. Based on these new subcontract selections, the Building Committee informed CTA that its new total contract award price was $21,528,000. Hingham’s acceptance of these subcontracts was an increase of $233,000 over the prior $3,610,000 allowance for the three trades that CTA had been required to use in its bid.
In its May 7 award letter, Hingham also instructed CTA to submit signed subcontracts or supplier purchase orders or invoices for all subcontractors and suppliers listed on CTA’s Schedule for Participation by Minority/Women Business Enterprises.
During the construction, Hingham and CTA continued their efforts to identify additional opportunities for increasing the amount of work that CTA could subcontract to minority and women business enterprises. Hingham determined that the amount of work CTA had subcontracted to minority business enterprises increased to approximately $1,407,603 and that the amount it had subcontracted to women business enterprises increased to approximately $717,933. Mahoney Aff. par. 43.
C. Bidding Law Principles and Their Application to the Facts of This Case
Brait argues that Hingham allowed CTA’s request for a reduction of the minority and women business participation goals even though CTA did not comply with the five-day deadline in the SOMWBA General Guidelines, Attachment C, Section 9. Brait contends that Hinham’s allowance of CTA’s late waiver request amounted a substantive violation of the public bidding statutes, G.L.c. 149, §§44A-44J, and G.L.c. 30, §39M, and the minority and women business participation statute G.L.c. 7, §40N. These statutes are applicable to this case because the project was a state assisted project. Brait contends that this violation made the award to CTA invalid and that this entitles Brait to lost profit and bid preparation damages.
As noted earlier, the SOMWBA General Guidelines, Attachment C, Section 9, requires a request for a reduction of the minority and women business goals to be received by the awarding authority no later than five working days after the awarding authority has mailed out the list of filed sub-bidders to persons who have taken out plans for the contract. The filed sub-bids for this project were filed on March 5, 2008. CTA did not comply with the five-day deadline because it did not send Hingham its goals reduction request until April 8. (Although it is not clear from the evidence, the court will assume that Hingham mailed the list of filed sub-bidders more than five work days before April 8.)
The case law does not require the court to declare a bid to be invalid if there has been no substantive violation of a statutory requirement of the public bidding laws. For example, in J.J. & V. Constr. Corp. v. Commissioner of Pub. Works of Fall River, 5 Mass.App.Ct. 391, 363 (1977), where the low bidder failed to include a certificate of equal employment opportunity compliance, the court upheld the authority’s decision as being within its discretion because there had not been a violation of a statutory requirement.
Even when there has been a violation of a statutory requirement, “minor deviations from statutory bidding requirements do not compel rejection of the bid or invalidation of a contract.” Sciaba Construction Corp. v. Boston, 35 Mass.App.Ct. 181, 185 (1993); see Gil-Bern Construction Corp. v. Brockton, 353 Mass. 503, 505-06 (1968) (“minor or formal deviations from [statutory] requirements do not compel rejection of the *448 bid”); Peabody Construction Co., Inc. v. Boston, 28 Mass.App.Ct. 100, 103-04 (1989) (when “the deviation from the statutoiy requirements is minor or trivial, the authority has discretion and may either accept or reject the bid”).
The cases “line up persuasively that public bidding authorities have discretion to waive or to count as disqualifying minor defects in bid responses.” Peabody Construction, supra, 28 Mass.App.Ct. at 106 (Kass, J., concurring).
In the present case there has been no violation of a statutoiy requirement, substantive or otherwise. The five-day waiver deadline that Hingham did not enforce was an interim “General Guideline” for municipalities of the State Office of Minority and Women Business Assistance.
The statute relied on by Brait, G.L.c. 7, §40N, explicitly preserves the right of the authority to “adjust the participation goals” for an individual project. G.L.c. 7, §40N(e). The goals maybe adjusted based upon “the actual availability” of minority-owned businesses and women-owned businesses and other relevant factors. Id. The statute directs the commissioner to develop a “written, good faith efforts waiver procedure" by which a public agency “may determine,” at any time before the award of the contract, “that compliance with the goals is not feasible.” G.L.c. 7, §40N(f). If the awarding authority determines that compliance with the goals is not feasible, it “may reduce or waive the goals” for an individual contract. Id. This is precisely what Hingham did in this case.
The only deadline imposed by the statute is that the determination that compliance with the goals is not feasible must be made before the award of the contract, as was done in this case. The noncompliance with the five-day waiver deadline was a procedural violation of the SOMWBA General Guidelines rather than a substantive violation of G.L.c. 7, §40N, or G.L.c. 140, §§44A-44J.
Brait also cites Hingham’s failure to comply with the General Guidelines requirement that a reduction of the SOMWBA goals be “made by a written addendum mailed to all persons who have taken out plans for the project.” SOMWBA General Guidelines, Attachment C, Section 9. The Guidelines addendum notice requirement unquestionably should have been complied with, but the Guidelines violation was not a statutoiy violation or a basis for invalidating the contract or awarding lost profit and bid preparation damages to Brait.
The public construction bidding statute, G.L.c. 149, §§44A-44J, serves several important purposes. The statute “enables the public contracting authority to obtain the lowest price for its work that competition among responsible contractors can secure . . .” Interstate Engineering Corp. v. Fitchburg, 367 Mass. 751, 757-58 (1975). The statute “establishes an honest and open procedure for competition for public contracts and, in so doing, places all general contractors and subbidders on an equal footing in the competition to gain the contract.” Id. The statu-toiy procedure “facilitates the elimination of favoritism and corruption as factors in the awarding of public contracts and emphasizes the part which efficient, low-cost operation should play in winning public contracts.” John T. Callahan & Sons v. Malden, 430 Mass. 124, 128, 713 N.E.2d 955 (1999); Annese Electric Services, Inc. v. Newton, 431 Mass. 763, 767 (2000).
The purpose of the minority and women owned business goals statute is to serve the “compelling interest in promoting the use of minority owned businesses and women owned businesses through the use of the available and qualified pool of minority and women owned businesses.” G.L.c. 7, §40N(a)(4).
In this case there is no evidence of favoritism or corruption. There is no evidence of bad faith. There is no evidence of an attempt to thwart the compelling statutoiy interest in promoting minority and women business participation in public contracts through the use of available and qualified minority and women businesses. Brait and CTA prepared their bids on an equal footing based on the same bid documents and the same subcontractor allowance information. The award went to the lowest bidder, CTA. Hingham made the award to CTA only after an extensive review of CTA’s request to reduce the minority and women business goals. Hingham allowed CTA’s goals reduction request based in part on the general bidders’ lack of control over the selection of sub-bidders on a substantial portion of the contract. Hingham also based its decision on the evidence of CTA’s outreach to hundreds of minority and women subcontractors and the small number of minority and women subcontractors who expressed interest in the project. Hingham thus lawfully considered “the actual availability” of minority-owned and women-owned businesses who were available and interested in participating in this project. G.L.c. 7, §40N(e).
With the allowance of CTA’s goals reduction request, CTA’s minority business commitments in its Schedule of Performance were $1,309,400 or 6% of the actual $21,528,000 contract award price. CTA’s women business commitments were $730,240 or 3.3% of the actual contract award price. Hingham did not abuse its statutory discretion in permitting the goals reduction and awarding the contract to CTA.
D. Order
Summary judgment will enter dismissing Brait’s claims.